Richard Paul MILLER, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 73 C 1798.

United States District Court, N. D. Illinois, E. D.

Dec. 2, 1976.

---

Herbert P. Veldenz, Chicago, Ill., for plaintiff.

Thomas P. Sullivan, U. S. Atty., William F. Murphy, Asst. U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This is an action brought by plaintiff, Richard Miller, against defendant, United States of America, under the Federal Tort Claims Act to recover damages for personal injuries plaintiff suffered when he dove into shallow water in Crab Orchard Lake which is owned by defendant. Jurisdiction is here under 28 U.S.C. §§ 1346, 2671–2680. Plaintiff alleges that he was in the exercise of ordinary care for his own safety and that

his injuries were proximately caused by defendant's negligence in failing to post signs indicating the depth of the water, failing to warn plaintiff of the shallowness of the water and allowing members of the public to swim and dive in an unsafe area. Defendant denies any negligence on its part, denies that plaintiff was in the exercise of ordinary care for his own safety, and alleges affirmatively that plaintiff assumed the risk, that plaintiff's injuries were proximately caused by his own negligence, that plaintiff's injuries were proximately caused by a person or persons unknown to defendant, and that in order to recover, plaintiff must show that defendant was guilty of "willful or malicious failure to guard or warn against a dangerous condition" in light of the provisions of the Illinois Recreational Use of Land and Water Areas Act, *Ill.Rev.Stat.* ch. 70, §§ 31–37, which defendant asserts is applicable and controlling here. Plaintiff replies that the Illinois Recreational Use of Land and Water Areas Act is not applicable to defendant. Alternatively, at the close of all of the evidence, plaintiff was granted leave to amend his complaint to conform with the proof and to allege a willful and wanton failure by defendant to perform the duties owed plaintiff and the general public. The cause has been tried without a jury on the issue of liability, damages being reserved under Rule 42(b) *Fed.R.Civ.P.* No evidence was adduced in support of defendant's third affirmative defense, *i. e.*, that plaintiff's injuries were proximately caused by a person or persons unknown to the defendant. Accordingly, that defense is stricken. The parties agree that under the Tort Claims Act, the law of Illinois controls. 28 U.S.C. § 2674. This memorandum will stand as our findings of fact and conclusions of law under Rule 52(a), *Fed.R.Civ.P.*

The Crab Orchard National Wildlife Refuge is situated in southern Illinois in the general vicinity of the cities of Carbondale, Carterville, Herrin and Marion. It is owned and operated by the United States Department of the Interior. Included in the refuge is Crab Orchard Lake, a 7,000 acre body of water with a shoreline of 127 miles. The east one-third of the lake is a wildlife sanctuary where the only permitted activity is fishing. The west two-thirds of the lake are open to the public and are used for all types of water activities, swimming, boating, water skiing and fishing. The boundary between the restricted area to the east and the public area to the west is marked by buoys and signs.

At the far west end of the lake, there is an improved area known as the west end boat dock which is where the incident in question occurred. It is served by a paved road or driveway into it from Spillway Road (which is one of the major thoroughfares around the lake); a paved ramp into the lake where boats may be launched off trailers; a rest room facility; a mowed grassy area with numerous trees; a sturdy wooden pier extending 50 feet into the water; and two paved parking areas, one adjacent to the boat ramp, the other adjacent to but separated from the pier by the grassy area and trees. The piers and the boat ramp are separated by the grassy area, trees and a small point or promontory of land with the result that the pier and boat ramp are not visible from one another. The pier was equipped with a rubber boat bumper (made from old fire hose) across the end which extends into the water. The pier was not equipped with a swimmer's ladder or raft.

At the intersection of the road which goes into the west end boat dock from Spillway Road, there was a sign which read "Boat Launching." That sign was some 1500 feet from the area. There were no signs in the vicinity of or adjacent to the boat ramp, the pier, the parking lots, the grassy area or the rest rooms. Specifically, there were no signs which prohibited swimming or diving.[1] There were, however, "No Swimming" signs posted at the spillway (or

---

1. The photographs in evidence which were taken subsequent to the occurrence in question show "No Swimming" signs stencilled on the pier. We have disregarded this subsequent remedial measure in our consideration of the question of defendant's "negligence or culpable conduct." Rule 407, *Fed.R.Evid.*

dam) where Spillway Road crosses it, at the Playport Boat Marina and in Devil's Lake and Grassy Lake, both of which are connected to Crab Orchard Lake.

About a quarter mile south on Spillway Road and a quarter mile east across the water from the west end boat dock were two areas where swimming was permitted. There is no evidence of the extent of their use on the day in question.

The water level of the lake varies as much as 12 inches over a summer season and in the fall the lake level is reduced 18 inches by opening the spillway. One of the plaintiff's witnesses, Fran Lence, had previously gone swimming at the west end boat dock. She testified that in June, 1970 when she was there, the water adjacent to the pier came up to about her shoulder. She is 5' 4" tall, so one can infer that the water on that occasion was about 4–4½ feet deep. In contrast is the testimony of plaintiff's witness, Jo Ann Duffy, who entered the water on the day in question to aid plaintiff after the occurrence. The water came up to about her hip, which in court measurements showed made the depth about 3 feet. Fran Lence also testified that when she was there in June of 1970, the water was within 3 or 4 inches of the top of the pier. On the other hand, Jo Ann Duffy testified that as she sat on the side of the pier on the day in question, her foot just touched the water. In court measurement showed this to be a distance of approximately 20 inches. In short, then, the depth of the water in the vicinity of the west end boat dock varied considerably from season to season and year to year.

The west end boat dock was not an authorized swimming area. However, the manager of the Crab Orchard National Wildlife Refuge knew that people went swimming and wading and picnicking there.

In an appendix to a memorandum dated July 17, 1964 from the Regional Supervisor, Branch of Wildlife Refuges, Minneapolis, Minnesota (which had jurisdiction over Crab Orchard) to the Regional Recreational Specialist, Branch of Wildlife Refuges, Minneapolis, Minnesota, regarding the Crab Orchard National Wildlife Refuge Recreation Plan, the following was specifically recommended:

"Beaches should be properly cleaned and maintained at all times and improved by sanding. Safety should be emphasized by the use of signs, depth markers and buoys to mark safe swimming distances from shore. Lifeguards should be on duty with life saving equipment readily available.

"*Warning signs giving notice that swimming is permitted only at designated beaches should be erected at all unsupervised locations where visitors are likely to swim.*" (Plaintiff's Exhibit 1, App. A, p. 2, emphasis added.)

It is undisputed that this recommendation was not followed in respect to the west end boat dock on the day of the occurrence in question.

Defendant's Exhibit 10, a printed brochure on the wildlife refuge, was posted on bulletin boards at various places throughout the refuge. In small type in the lower center of the inside of the brochure appears the statement:

"Swimming is permitted only at designated beaches. Lifeguards are stationed at these areas during periods of heavy use. Swimmers are cautioned to observe posted regulations for their own safety."

But it is undisputed that even this was not posted at the west end boat dock. Furthermore, the testimony showed that during periods of light use, lifeguards were not on duty at the designated swimming areas.

The shore from which the pier at the west end boat dock extends is quite rocky. The photographs in evidence depict rocks of such a nature as to lead to the inference that they were placed there to prevent erosion. But the rocks cease a few feet from shore and the bottom becomes sandy and gradually slopes down. The bottom remains visible for 8 or 10 feet from the shore. As one goes out on the pier the water becomes murky and the bottom is no longer visible. Murkiness is a characteristic of the waters of Crab Orchard Lake because of its silt bottom.

On May 23, 1972 plaintiff, Richard Paul Miller, was 20 years old and in good health save for a 100% hearing loss in his right ear and a 40% loss in his left. He had been a swimmer and diver most of his life. He had been swimming in Crab Orchard Lake as a youngster with his family and as he recalled, he had gone to Carterville Beach with a friend the previous summer. He had not, however, ever been swimming at the west end boat dock and the day in question was his first visit to the lake in the summer of 1972.

When he was a youngster his mother told him that he should not dive into water of unknown depth. She tried to teach him to be careful. On cross examination he acknowledged that it is "common sense" not to dive into water of unknown depth and he grimly acknowledged that on the day in question he did not know the depth of the water at the west end boat dock.

On May 23 at about 2:30 a. m. Richard finished working his job as a counterman at a restaurant in Carbondale. He hitchhiked home to his trailer in Herrin and got to bed sometime between 5:30 and 6:30. Around noon four friends came to his trailer: three young women, Jo Ann Duffy, Fran Lence and Christine Kedziolka, and a young man, James Miller, not related to Richard. They were all in the 19 to 20 age bracket. At one point in the trial, the Government made much of the fact that two of the young women had hitchhiked down to the Carbondale area from Chicago the day before. We did not see the relevance of that fact at the time it was adduced, and we do not see it now. Suffice it to say that all of the evidence shows that these young people conducted themselves on the day in question in a sensible, responsible, sober way.

Richard was buying some property on contract which was located in the vicinity of the Crab Orchard Refuge. He invited his friends to go out and see it and they did so in Fran Lence's car.

After inspecting the property, they started back to Richard's trailer when one of them, either Richard or Jo Ann Duffy, suggested going swimming for it was a warm early summer day. No one had bathing suits or towels, but they were all dressed casually. Richard had on some cut-away shorts, a tank top, shirt and sandals. Fran Lence, who was driving, said that she knew of a perfect spot and she drove the group to the west end boat dock area. They arrived about 3:00 p. m. The car was parked in the parking lot nearest the pier.

All got out of the car. Richard took off his tank top and sandals and left them together with his cigarettes in the car. He and Jo Ann Duffy and Fran Lence moved out ahead of Christine Kedziolka and James Miller; in fact they may have trotted ahead toward the pier along the path which crossed the grassy area between the parking lot and the pier.

Richard arrived at the pier first, followed by Jo Ann Duffy and then Fran Lence. Two people were sitting at the end of the pier in light casual clothes. Two or three people were in the water along the left side of the pier, out perhaps a third of the distance to the end. The water appeared to be of varying depths on their bodies. Out in the water at the end of the pier and about 10 or 15 feet to its left, a man, whose head and shoulders were visible, but whose arms and legs were not, appeared to be treading water.

Richard went out almost to the end of the pier and stood near the people who were sitting there. Jo Ann sat down on the edge of the pier between Richard and the shore and put her foot in the water. Richard asked the people at the end of the pier how the water was, and they responded, "Fine." He then dove into the water off the left side of the pier. His dive was not a belly flop; it was not a deep dive; it was sort of a flat surface dive. Just as he pushed off the pier, one of the persons at the end of the pier said, "Be careful, it isn't very deep," or "Be careful, the water's shallow." Richard did not hear the warning but if he had it would have been too late because he was already in the air on his dive.

Richard testified that as soon as he entered the water, he felt numb all over. He became conscious of the fact that his lip or

tongue was bleeding. He could not move. He started to take in water. He thought he was going to die.

Jo Ann Duffy and Fran Lence saw Richard come to the surface of the water. Only his back was visible. They thought he was "horsing" around, but when he remained that way for what now seemed to have been a minute or two, they realized something was wrong and went out and got him. They brought him to the pier and put him up on it. A redheaded man whose identity is unknown, applied mouth-to-mouth resuscitation. James Miller and Christine Kedziolka went to get the rescue squad.

Richard Miller is a quadriplegic. Evidently he struck his head on the bottom of Crab Orchard Lake. When asked what he had considered regarding the safety of the situation before diving, Richard testified that it was a long pier, there were people in the water, there was a man out near the end of the pier who appeared to be treading water, Fran Lence had said she knew of the place and it was perfect, he had asked how the water was and was told that it was "fine," the water appeared deep, and the bottom appeared to slope down from the shore.

The threshold legal question is the applicability of the Illinois Recreational Use of Land and Water Areas Act, *Ill.Rev.Stat.* ch. 70, §§ 31–37. On May 30, 1975 we entered a memorandum order denying plaintiff's motion to strike defendant's affirmative defense based upon the Act. The motion was based upon the alleged constitutional invalidity of the Act. At that time we assumed the Act applied to defendant. Since then, additional authority has been called to our attention to the end that we now conclude that the Act does not apply to defendant.

The Act provides that a landowner who permits his land to be used for recreational purposes, has no duty of care to keep the premises safe for use for recreational purposes or to warn those who use his land for recreational purposes of any dangerous condition thereon. (Section 33.) The Act does not, however, limit the landowner's liability for "willful or malicious failure to guard or warn against a dangerous condition . . ." (Section 36(a).)

There was also in effect in Illinois at the time of the occurrence in question, the Recreational Area Licensing Act. *Ill.Rev.Stat.* ch. 111½, §§ 761–785. This Act contemplates comprehensive safety and health regulations in respect to persons who operate recreational areas which are defined in such a way as to encompass an area like the Crab Orchard National Wildlife Refuge.[2]

This is not to say that the Illinois General Assembly could directly regulate the defendant's maintenance and operation of the wildlife refuge. But if the wildlife refuge were in private ownership (or under Section 762(e) of the Recreational Area Licensing Act owned by an "individual, . . . partnership, corporation, . . . county, municipality, the State of Illinois, or any

2. *Ill.Rev.Stat.* ch. 111½ § 762 reads:

As used in this Act, unless the context requires otherwise:

(a) "Recreational Area" is any area of land where 1 or more tents, cabins, recreational vehicles or other permanent or non-permanent type shelters are erected and maintained for 10 or more persons for 7 or more consecutive days or 10 or more days during a calendar year for recreational activities, or camping; or where space for 10 or more persons for 7 or more consecutive days or 10 or more days during a calendar year for recreational activities, camping or temporary parking of recreational vehicles is furnished either free of charge or for revenue purposes, for the placing of such tents, cabins, recreational vehicles or other permanent or non-permanent type shelters; or where space for recreational activities or camping is permitted for 10 or more persons for 7 or more consecutive days or 10 or more days during a calendar year free of charge or for revenue purposes without shelters of any kind, and it shall include any structure, tent, vehicle, enclosures, recreational vehicle facility or equipment related or used or intended for use as a part of such recreational area.

(b) "Recreational Activities" include, but are not limited to hunting, fishing, swimming, boating, camping, racing, picnicking, hiking, pleasure driving; nature study, water skiing, festivals, public gatherings and visiting historical, archaeological, scenic or scientific sites, or for any purpose, including but not limited to educational, vocational and religious activities and assemblies.

.     .     .     .     .

political subdivision or department thereof, or any other entity"), its maintenance and operation would be subject to the Recreational Area Licensing Act and its owner would not be entitled to the asserted protection of the Recreational Use of Land and Water Areas Act.

■ The entire legislative scheme should be read *in pari materia*. When it is, it becomes clear that the Recreational Use of Land and Water Areas Act is intended for those who permit open lands to be used recreationally on a casual basis. But those who hold their property out to the public for recreational purposes, and maintain their property for recreational use by the number of persons that are prerequisite to the application of the Recreational Area Licensing Act, they are subject to the provisions of the latter and not entitled to the asserted protection of the former.

■ Defendant, under the Federal Tort Claims Act, is entitled to the benefit of that law which would apply to a "private individual under like circumstances." 28 U.S.C. § 2674. For the reasons that we have stated, we have concluded that a private individual, operating a recreational facility the likes of the Crab Orchard National Wildlife Refuge, would not be entitled to the protection of the Recreational Use of Land and Water Areas Act. Accordingly, the defendant, United States of America, is not.

■ Therefore, defendant owed plaintiff a duty of reasonable care. What occurred here was foreseeable. The danger was known to the defendant. Others had been observed wading and swimming at the west end boat dock. Defendant also knew of the varying depths of the water; indeed it controlled those depths. Defendant's own safety recommendations regarding the recreation plan at Crab Orchard National Wildlife Refuge specifically included "safety should be emphasized by the use of signs, depth markers and buoys to mark safe swimming distances from shore . . . Warning signs giving notice that swimming is permitted only at designated beaches should be erected at all unsupervised loca-tions where visitors are likely to swim." Yet defendant took no steps to warn plaintiff and others who went to the west end boat dock to swim, wade and picnic of the danger of the shallow water. Defendant did not act with reasonable care when it failed to post any warnings or take any precautionary measures with respect to swimming and diving at the west end boat dock. Defendant was negligent and its negligence was a proximate cause of plaintiff's injury.

■ If we were to reach a contrary conclusion in respect to the application of the Recreational Use of Land and Water Areas Act, we would nevertheless find that plaintiff had proved defendant was at fault. Under the Act a landowner remains liable for "willful or malicious failure to guard or warn against a dangerous condition . . ." (Section 36(a).) The statute has not been construed by the Illinois courts. But similar statutory language in the Illinois Structural Work Act (*Ill.Rev.Stat.* ch. 48, §§ 60–69) has been construed by the Illinois Supreme Court.

Section 69 of the Structural Work Act provides for a right of action for "injury to person . . . occasioned by any willful violations of this act . . . ." The Illinois Supreme Court has held that a "willful violation" of the Structural Work Act occurs whenever "by the exercise of reasonable care the existence of such dangerous conditions could have been discovered and become known." *Kennerly v. Shell Oil Co.,* 13 Ill.2d 431, 439, 150 N.E.2d 134, 139 (1958). "The essence of the Structural Work Act is not limited to the concept of knowing or intentional or even to reckless disregard. Liability is imposed where the existence of dangerous conditions could have been discovered by reasonable care." *Tenenbaum v. City of Chicago,* 11 Ill.App.3d 987, 1000, 297 N.E.2d 716, 723 (1st Dist. 1973), *aff'd in part, rev'd on other grounds,* 60 Ill.2d 363, 325 N.E.2d 607 (1975).

■ Applying this interpretation to the language of Section 36(a) of the Recreational Use of Land and Water Areas Act, we find that defendant could have discovered—

in fact it knew—of the dangerous conditions at the west end boat dock, but it did nothing to remedy them or warn users against them. It willfully failed to guard or warn against a known dangerous condition.

 Defendant strenuously urges, however, that Richard Miller failed to exercise due care for his own safety, and was guilty of contributory negligence or assumption of the risk as a matter of law. In view of our conclusion that defendant's breach of duty was willful, mere contributory negligence or assumption of the risk would not preclude plaintiff's recovery. But assuming that defendant's breach was merely negligent and not willful, we find in light of all the evidence in the case, that plaintiff was neither contributorily negligent nor did he assume the risk.

Plaintiff approached an improved area by way of a paved access road. There was a parking lot. There were wash room facilities. There was a path to the pier. The boat launch was separate and not visible from the pier. The pier extended out into the water 50 feet. The water near the shore was clear and plaintiff observed that the bottom was sandy and sloped. People were in the water about a third of the way out with the water at various points on their bodies. There was a man off the end of the pier in the water to his shoulders who appeared to be treading water. There were people at the end of the pier of whom plaintiff enquired about the water who responded to him that it was "fine." One of plaintiff's friends had assured him that the spot was "perfect" for swimming. The evidence shows that her opinion was based upon her own experience there when the water was at least 4 to 4½ feet deep. Most significantly, there were no warnings of any kind.

Plaintiff's dive was not a deep one. The risk was a hidden one of which plaintiff had no comprehension or awareness. *Fore v. Vermeer Mfg. Co.*, 7 Ill.App.3d 346, 287 N.E.2d 526 (3d Dist. 1972). In all of the circumstances, plaintiff took reasonable precautions before entering the water. We find that he exercised ordinary care for his own safety and was not guilty of contributory negligence.

In *Pleasant v. Blue Mound Swim Club*, 128 Ill.App.2d 277, 262 N.E.2d 107 (4th Dist. 1970), the court held that plaintiff was not guilty of contributory negligence in failing to test the depth of water beneath a diving board in a swimming pool before making his dive. There the Illinois Appellate Court held that on the basis of the evidence, the finder of fact could find plaintiff free of contributory negligence. We make a similar finding here.

Accordingly, the issue of liability is decided here in favor of the plaintiff, Richard Miller, and against the defendant, United States of America. The parties are directed to appear at 9:30 a. m. on December 15, 1976 to report on their readiness to proceed to trial on the issue of damages.