James A. STEPHENS, Plaintiff,

v.

UNITED STATES of America,
Defendant,

v.

The STATE OF ILLINOIS,
Third-Party Defendant.

No. 77–3050.

United States District Court,
C. D. Illinois,
Springfield Division.

May 15, 1979.

Anthony P. Corsentino, Sweat & Sweat, Peoria, Ill., William T. Cahill, Richard J. Phelan, Phelan & Pope, Chicago, Ill., for plaintiff.

Sandra Simon, James P. Klapps, Paul Figley, U. S. Dept. of Justice, Tort Section, Civ. Div., Washington, D. C., John Germeraad, Asst. U. S. Atty., Springfield, Ill., William S. Hanley R. Gerald Barris, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., Springfield, Ill., for State of Illinois, third-party defendant.

## MEMORANDUM ORDER

ACKERMAN, District Judge.

### I. Introduction

On May 27, 1975, James A. Stephens suffered serious injuries when he dove into Lake Shelbyville from the shore of a cove located in Eagle Creek State Park. After the Department of Army Corps of Engineers denied Stephens' claim under 28 U.S.C. § 2675, he filed a three count complaint against the United States pursuant to the Federal Tort Claims Procedure Act, 28 U.S.C. § 2671 *et seq.*, with jurisdiction premised on 28 U.S.C. § 1346(b).

As will be developed later in this opinion, the land area involved in this suit is owned by the United States and leased to the State of Illinois. Based upon a hold harmless clause in the lease, the United States filed a third party complaint against the State of Illinois for indemnification of the amount of any judgment rendered in favor of James A. Stephens. The Court denied the State of Illinois' motion to dismiss the third party complaint, but allowed a joint motion of the parties to sever the third party action from the trial on issues of liability as raised in the plaintiff's complaint.

A bench trial solely on the issue of liability was held on December 6–8, 11 and 12, 1978. Because the State of Illinois, as third party defendant, may be bound by the result of the trial on liability between plaintiff and defendant, it was permitted to fully participate in the trial and did so. On the eve of trial the United States filed a motion to dismiss, or in the alternative for summary judgment, which raised several substantial legal issues. I elected to take up the motions following the trial and the parties have now fully briefed the legal issues as well as submitting proposed findings of fact. This memorandum order will be entered as my findings of fact and conclusions of law under F.R.Civ.P. 52(a).

Plaintiff's injury occurred when he dove into the water from the shore of a cove and hit his head on what he contends was a submerged tree stump. Stephens received a laceration of the frontal scalp which allegedly resulted in permanent paralysis of his legs and hands (quadriplegia). Proof on the nature, extent and duration of injuries was reserved for the damages portion of the trial should plaintiff prevail on the liability issue. Plaintiff's complaint premises liability of the United States upon three theories: Count I, negligence; Count II, wilful and wanton acts or omissions; and

Count III, careless or negligent acts or omissions involving the United States contract with Humphrey Contracting Company to clear the timber from the land in question for creation of Lake Shelbyville. Plaintiff did not introduce any evidence at trial on Count III, apparently abandoned it, and judgment is accordingly entered for the defendant as to that count.

In Count I plaintiff alleges that the Army Corps of Engineers has retained management and control of the swimming areas of Eagle Creek State Park, notwithstanding the lease to the State of Illinois. Agents of the United States are alleged to have been guilty of one or more of the following careless and negligent acts or omissions which proximately caused plaintiff's injuries: (1) failed to remove submerged tree stumps from the swimming areas of Lake Shelbyville, (2) failed to prohibit diving by all persons on all swimming areas of Lake Shelbyville which contained submerged tree stumps, and (3) failed to warn the plaintiff of the existence of the hidden danger of submerged tree stumps in said swimming areas of Lake Shelbyville.

Plaintiff's Count II incorporates the allegations of Count I, realleges the actions and omissions stated as negligence in Count I, and contends they are sufficient to establish wilful and wanton acts or omissions by the United States which proximately caused plaintiff's injuries.

As to Count I, the United States denies any actionable duty owed by defendant to plaintiff, denies committing any negligent acts or omissions, and further contends plaintiff is barred from recovery by either his failure to prove freedom from contributory negligence or by the doctrine of assumption of the risk. It is also contended that the negligence action must be dismissed because the United States is an "individual" covered by the Illinois Recreation Use of Land and Water Areas Act, Ill.Rev. Stat. ch. 70 §§ 31–37 (1965) and is thus not liable for ordinary negligence.

Defendant contends that both Counts I and II should be dismissed for lack of subject matter jurisdiction because plaintiff's claims are barred by the discretionary function exception of the Federal Tort Claims Procedure Act, 28 U.S.C. § 2680(a). In addition to the jurisdictional objection to Count II, defendant contends that none of its acts or omissions constitute wilful and wanton misconduct. With this view of the legal and factual issues involved, I turn to a detailed discussion of the factual situation relevant to this accident.

## II. Facts

The Shelbyville Dam and Reservoir Project was a portion of a multiple-purpose plan of improvements for the Kaskaskia River Basin. Objectives included providing flood control in the Kaskaskia River Valley, providing improved water supply and pollution abatement, and providing minimum pools for recreational use and conservation of fish and wildlife.

Construction of the project was started in May, 1963. The reservoir basin contained forested areas which were cleared prior to impoundment of water behind the dam. The area of the cove where the accident occurred was cleared by Humphrey Contracting Corporation pursuant to a contract with the United States Army Corps of Engineers. Section 2 of that contract dealt with timber clearing and Paragraph 4 of that section reads as follows:

4. *Clearing Requirements*—All trees, brush, other growth and down timber within the clearing limits and silt ranges shall be cut to a height not to exceed six (6) inches from the ground surface as measured on the uphill side. Clearing of submerged down timber from lakes and ponds will not be required.

This Paragraph 4 is based upon a Guide Specification for Clearing issued by the Department of the Army Corps of Engineers, Office of the Chief of Engineers. Paragraph 1–06(c) of that Guide Specification provides: "All trees and stumps, not falling within the classification of brush, shall be removed to a height not exceeding six (6) inches above the ground surface measured on the uphill side."

There was no evidence presented which established the rationale for not removing the trees entirely or not cutting them all level to the ground. The contractor used bulldozers with cutting blades attached and chainsaw crews for the clearing of trees. As to those trees which were cut nothing would indicate that the contractor failed to meet or exceed the 6″ height requirement. Clearing occurred up to approximately elevation 603 and was completed in 1968.

Following construction of the reservoir, water was impounded by the Shelbyville Dam in the summer of 1970. The artificial lake formed is called Lake Shelbyville which during normal pool elevations (599 feet above sea level) is approximately 11,000 acres in size, approximately twenty miles long, and has approximately 172 miles of shoreline. The Army Corps of Engineers controls the water level of Lake Shelbyville by operation of the dam.

The lease agreement between the Corps of Engineers and the Illinois Department of Conservation applicable to Eagle Creek State Park requires the State to comply with all regulations and rules promulgated by the Corps for Lake Shelbyville, including the "Project Safety Plan," "Project Resources Management Plan," and the "Master Plan," and further requires Corps approval for all fees charged the public by the State.

The Corps of Engineers employs reservoir rangers whose primary responsibilities include assisting the using public, patrolling all project recreation areas, and inspecting all Government lands. Land inspections are performed by rangers on a regularly scheduled basis and include all Government land and all outgranted land. Eagle Creek State Park is an area of outgranted land which was inspected by the rangers. Both the water areas and land areas in Eagle Creek State Park were inspected on a regular basis from 1973 through 1975 by three different Corps rangers. The inspections were to determine whether the State was in compliance with safety regulations and plans promulgated by the Army Corps of Engineers. Included in the inspections were ob-servation of visitor water and land safety hazards. They also checked to see whether bulletin boards were placed in conspicuous locations throughout the recreation area and posted with safety-oriented material; and whether warning signs, barricades, fences, etc., were utilized to warn visitors of dangerous areas and prevent access where necessary.

The State of Illinois employed Department of Conversation rangers to patrol Eagle Creek State Park on a regular basis. Their duties included inspections to assure the park rules and regulations were complied with and assisting the public. It appears that the patrols were primarily of the land areas of the park and the state rangers were rarely on Lake Shelbyville except perhaps around the boat launch area.

There can be no doubt that the Army Corps of Engineers knew that at all times since its creation Lake Shelbyville contained tree stumps. The Corps' Guide Specifications and contracts for clearing allowed 6″ stumps to remain. After the clearing and prior to impoundment the stumps must have been observed. Following the impoundment and depending upon the water level, the stumps would be exposed or submerged. At least two corps employees, Frank Schafer and Thomas Bloor, knew of tree stumps in the lake. Schafer saw them during construction but after the impoundment of water he never observed any. Bloor saw stumps after the impoundment of water but only during low water level periods (5 or more feet below normal pool). No evidence was introduced which established that the Illinois Department of Conservation had knowledge of the existence of submerged tree stumps in the lake. Nothing indicates that the Illinois rangers observed the stumps or that they were informed of them by the United States.

In 1975, the Army Corps of Engineers shared the responsibility with the Illinois State Department of Conservation for patrolling Eagle Creek State Park and assuring that all of the federal rules and regulations, including those regarding safety, were complied with. It does not appear

that the Corps controlled or directed the State of Illinois with respect to day-to-day patrolling or with respect to the type, number, or location of "no diving" or "no swimming" signs. However, the Corps did retain the responsibility and authority to require the State, or to supply themselves, adequate safety signing throughout the park.

The Corps rangers specifically inspected for adequate posting of Title 36 (C.F.R.) in Eagle Creek State Park. Title 36 contains the minimal regulations which apply on out-granted land (36 C.F.R. § 327.23). Section 3276 of Title 36 provides:

> Swimming, snorkling, or scuba diving is permitted, except in those areas of the lake, reservoir, or other body of water designated by the District Engineer and marked by the posting of appropriate signs.

The Corps rangers did not post any "no swimming" or "no diving" signs in Eagle Creek State Park.

The only cautionary statement made by the Corps to the public regarding submerged stumps was a caution contained on the back of a brochure entitled "Title 36 of the Code of Federal Regulations." The cautionary warning stated, *inter alia*: "Users must be alert to underwater hazards. Submerged stumps, logs and rocks are present in the lake." This brochure was systematically distributed only to persons who camped and paid a fee. Daily users of the lake were not provided with the brochure unless they obtained one from a Corps facility at Lake Shelbyville. Thomas Bloor recalled that while Title 36 was posted on bulletin boards in Eagle State Park, the cautionary warning was not posted.

The Illinois Department of Conservation rangers specifically inspected for adequate posting of Article XX of the Regulations of the Department of Conservation of the State of Illinois. Section 31 of Article XX provides that it shall be unlawful "[f]or any person to swim in any area where posting indicates that swimming is prohibited."

The Illinois rangers placed administrative bulletin boards throughout the park. It was on these boards that Title 36 and Article XX were posted. In addition the evidence would support that at most a total of 13 "no swimming" signs were made for use in both Eagle Creek and Wolf Creek State Parks. These were 1' × 6' boards, 36" long with 3" lettering. They were attached to a 2' × 4' stake and placed adjacent to some of the bulletin boards. Don Foreman, the Illinois Head Ranger from 1970 through June of 1975, testified that such a "no swimming" sign was posted at an administration bulletin board in the peninsula camping area near the cove in question. However, Illinois Rangers Norrick and McKittrick, who patrolled on a more regular basis than the Head Ranger, could recall a "no swimming" sign at only the boat launch area. They could not recall a sign by the bulletin board in the peninsula camping area.

In addition to the bulletin boards and the sign or signs, the State of Illinois had available at the park office and various park locations a brochure entitled "Illinois Department of Conservation Recreational Areas" describing the facilities available at all Illinois State Parks including Eagle Creek. Included among "For your information" is the following: "Swimming is permitted at Illinois Beach (beach and pool) and Dixon Springs (pool). Swimming or wading is not allowed on any other site." This "information" was not systematically made available to visitors to the park unless they stopped to obtain it. On its face this brochure indicates that of the 65 state parks and 24 Illinois conservation areas listed, swimming or wading is allowed only at two places, neither of which are in Eagle Creek State Park.

All of the Illinois Department of Conservation rangers who testified knew and understood that swimming was not permitted anywhere in the Park. It was the Department of Conservation policy that swimming was not permitted unless designated as a swimming area. In fact, the Department's Ranger Manual provided that:

> It is unlawful . . . for any person to swim or bathe in any water area

under the management of the Dept., except in certain designated areas which are marked by proper signs designating such swimming or bathing areas.

In addition to the obvious conflict between Article XX (swimming unlawful only where posted as prohibited) and the Ranger's Manual (swimming unlawful except where posted as permitted), it is beyond question that the State of Illinois did not adequately communicate to the public its understanding that swimming was prohibited generally throughout Eagle Creek State Park.

The foregoing establishes the entities which shared the responsibility for visitor safety and the precautions they took in that regard; the following is a brief history of the development of the area in which the cove in question was located. The scene of the accident was on a portion of Eagle Creek State Park leased to the State of Illinois on April 1, 1968, by the United States acting through the Department of Army Corps of Engineers. Eagle Creek State Park is a 2,300 acre recreational area situated on a portion of the western shoreline of Lake Shelbyville. The only other state park on Lake Shelbyville is Wolf Creek State Park which is on the opposite (eastern) side of the lake from Eagle Creek State Park.

The State of Illinois had prepared a design report and plan for General Park Development of the state parks in the Shelbyville Reservoir. The plan called for site development on an area basis to be accomplished according to a designated priority. Eagle Creek State Park was originally opened by the Department of Conversation in 1970. By 1971 there were only two camping and public use facilities besides the boat dock. One of these areas was a peninsular campground at the end of a township road which had been partially submerged with the water impoundment. This area was located at the northern end of the park.

In following years the Park developed and other camping areas were opened. The peninsula campground area was closed to vehicles by the erection of a barricade in 1974; the camping area was approximately one-half mile beyond the barricade. From 1974 through May of 1975, this area had been used for groups such as Boy Scouts and overflow camping. In 1975 this area reportedly experienced very low use. However, on peak weekends during this period the entire Lake Shelbyville recreational area averaged 50,000 visitors daily and approximately 3,000,000 visitors each year. The accident file maintained at the lake management office by the Corps of Engineers reflects no reported incidents of personal injury relating to a stump in the area of the cove or at any other location on the lake prior to this accident. It was to this cove portion of the park that plaintiff came on the day in question.

On May 27, 1975, James Stephens, who was twenty years old, and two companions, Gail Howell and Dennis Shorey, came to Eagle Creek State Park in the late morning. They entered the Park through its single entrance and parked their car in a parking lot near the barricade across the old township road leading to the peninsula campground area. No admission fee was required or paid. It was a warm, sunny, clear day. None of the trio had been to this camping area before. They stopped there on this occasion because apparently it was the first place they came to after arriving at the park. They took their fishing gear and cooler filled with food and beverages from the car and walked down the old road about one-half mile to a picnic area, and proceeded on down a path to a cove.

The only signs which were visible to Jim Stephens, Gail Howell and Dennis Shorey as they entered the park and made their way to the cove was the one located at the entrance which stated "Welcome to Eagle Creek State Park" and another which directed them to the picnic and backpack area of the park. The evidence established that there were no "no swimming" or "no diving" signs anywhere along the route by which these young people entered the park, parked their car, and walked to the cove. At least one of the trio, Gail Howell, was looking for signs.

The cove where these young people located was bordered by a forest area. The tree line was approximately five feet inland from the water's edge. Varying size and denseness of vegetation grew from the tree line down to the water's edge or to within one foot of the water's edge. The soil along the water's shoreline was a sandy clay. The water was murky with visibility limited to a few inches below the water surface.

Upon arriving at the cove, Jim Stephens began to fish at the "point" of the cove, approximately 150 feet east of the area where the three youths entered the cove and put down their cooler. Jim Stephens fished at the "point" for a couple of hours, until approximately 1:30 p. m., when he decided to go swimming. He was wearing swim trunks under his jeans.

He walked back down the shoreline of the cove, to the approximate area where the youths had originally entered the cove. Jim Stephens waded into the water to the level of his waist (he guessed it was six feet from the shore) and began to swim in the middle of the cove. He waded in and out and swam in this fashion intermittently for a couple of hours. Gail Howell and Dennis Shorey also swam in this general area with Jim Stephens. They did not encounter any objects in the water.

After swimming for a couple of hours, Jim Stephens returned to the "point" where he resumed fishing. A little later he swam alone out into the Lake east of the "point" for a few minutes and again returned to fishing.

Shortly prior to 4:30 p. m., Jim Stephens stopped fishing and walked back west into the cove where he previously had waded into the water to go swimming. He, Gail Howell and Dennis Shorey were seated in a clear area on the shoreline talking. At approximately 4:30 p. m. three fishermen entered the cove by boat. One of the fishermen stated that he had lost his fishing pole in the water and requested the youths to retrieve it for him. Jim Stephens responded that he would. At the time he was seated in a clearing two to three feet from the water's edge. He stood up, took one step and dove into the water. His arms were extended in front of him at about shoulder width. His head and chest entered the water and he then felt a sudden jolt that completely stopped him in the water. At the time of impact he had not commenced his swimming stroke. His hands and arms had not touched the bottom. His body floated to the surface and he was rescued by Dennis Shorey. He was unable to move his hands, arms or legs after striking the object.

The area where Jim Stephens made his dive was the same general area where he waded into the water while swimming earlier in the afternoon.

Jim Stephens did not strike his arms or hands on anything when he dove and there were no abrasions or marks on his hands, arms, chest or the remainder of his torso. His head was lacerated just behind the hairline from one side of his head to the other.

Jim Stephens had intended to execute a shallow dive which would propel him just below the surface of the water. He had been a member of a swim club from age 8 or 9 to age 14 where he competed in swimming meets, and he learned how to perform a racing dive as a teenager. He had taken Red Cross classes containing instruction on water safety.

Dennis Shorey observed Jim Stephens make his dive. He recalled that Jim dove straight out from the shore; his body entered the water and when his feet were about to enter the water his body suddenly stopped. Stephens was about one body length and a little farther in the water when he stopped moving. Shorey brought him to shore and observed that Stephens' head was bleeding.

Jim Stephens concluded that the object he struck must have passed between his outstretched arms. He also concluded that it was a fixed object because it stopped him suddenly in the water. He further concluded that the top of the object must have been positioned near the water's surface because the dive he performed is a dive which propels the swimmer out into the

water rather than down in the water. The only object he concluded it could be was a tree stump. Dennis Shorey went back to the scene a few weeks later and located what he thought was the stump that Jim Stephens struck but he could not be sure. There is no conclusive evidence as to what was struck. Neither Stephens nor any witness saw what he hit.

Jim Stephens had fished at Lake Shelbyville 10 to 15 times prior to the occurrence, but he had never been to the cove previous to his accident. He had never been north of the dam until after the lake had been created. On two prior occasions, he had swum in the Lake, both times from a boat. On none of those occasions had he observed submerged tree stumps, but he had observed rip rap along the shores, floating limbs and logs, and standing trees which had been left in some coves by the Army Corps of Engineers as fish habitat.

Prior to the dive, Jim Stephens had seen one large stump, 2½ feet in diameter, which was located at the "point". This stump was cut level to the ground. Dennis Shorey also observed a large "flush cut" stump at the "point" on the day of the occurrence.

Jim Stephens, Gail Howell and Dennis Shorey observed no stumps, floating logs, stationary logs, rocks or boulders in the cove in the area where they swam. There was no eyewitness testimony from anyone which indicated the presence of obvious tree stumps in the cove area which was the scene of this accident.

Jerome A. Molitor, Chief of Radiology at St. Louis City Hospital, treated Jim Stephens at the scene of the occurrence. Dr. Molitor diagnosed his injuries as a laceration of the forehead and paralysis.

Dr. Molitor, who was very familiar with Lake Shelbyville as a result of frequent boating on the Lake, knew that there were tree stumps in Lake Shelbyville but did not observe any stumps, sticks or rocks in the area where Jim Stephens dove from the shore or in the water. He described the shoreline as having a very gradual slope. He did observe that vegetation was growing on the shoreline up to the water's edge.

Dr. Molitor is of the opinion that Jim Stephens struck a blunt object rather than a sharp object. A sharp object would have penetrated the skull, causing a skull fracture. He opined that a floating log would not have caused the injury because it would have "given" with the impact. Dr. Molitor is of the opinion that the injury was not caused by an object floating at or under the water surface. He related that the chances of Stephens having struck a floating object are essentially none. He based this on the nature of the injury and his knowledge of the lake. Concerning the possibility of striking a rock, Dr. Molitor does not believe that the object struck was sharp and he has not seen many rocks in Lake Shelbyville.

The elevation of the water in Lake Shelbyville was recorded at the dam. These records show that in January, 1975, the water level was 590 feet above sea level. In the Spring of 1975 the level began to rise until by May 27, 1975 it was 597.03 feet. Normal pool elevation is 599.7 feet.

No ground level photographs of the cove as it appeared on the day of the accident or within several months thereof were presented at trial. On April 21, 1975, aerial photographs had been taken at an altitude of 4,500 feet of areas of Lake Shelbyville including the cove in question. Mr. Carl Zaritz, a photogrammatrist, gave his opinion that the photograph showed 21 shadows cast by objects which on the basis of information supplied by others he concluded were tree stumps. The water level on the date of his photograph was seven feet lower (590.15) than on the day of the occurrence. Mr. Zaritz noted that as of April 21, 1975, the shoreline in the photograph was devoid of vegetation.

A number of photographs were introduced at trial which were taken months to years after the accident. In December of 1978 the Army Corps of Engineers had a survey conducted at the cove. The water level on the day of the survey was 597.95 (one foot higher than on the day of the occurrence). Because of the erosion and change in the slope of the land and the

presence or lack of vegetation, it is not possible to draw any conclusive findings based upon the survey or the pictures. The same can be said of a movie of the cove taken on September 29, 1978. It is more probable than not that there were some stumps present along the shoreline of the cove between the water's edge and the tree line on the date of the accident. It is also probable that vegetation on this same area varied in the thickness and some of the stumps were not visible. It is believable that none of the young people actually saw a stump other than the ones at the point.

### III. Legal Analysis

#### A. *Discretionary Function Exception*

In 1946, Congress enacted the Federal Tort Claims Act (FTCA) which waived the United States Government's immunity from certain tort actions. However, 28 U.S.C. § 2680(a) (1970), expressly excepts from the Act's coverage:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Government contends that "the decision to leave the tree stumps at a specified height and the procedure for implementing that decision falls within the discretionary function exception to the FTCA" and the Court is deprived of subject matter jurisdiction generally defined at 28 U.S.C. § 1346(b).

■ Federal District and Appellate Court decisions and law review articles abound on the question of which discretionary acts or omissions were excepted from the FTCA by Congress. *See also,* Annotation, 99 A.L. R.2d 1016 (with paper supplement). The language, the legislative history, and the leading interpretation of the exception by the United States Supreme Court, *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), have neither defined where discretion ends nor suggested a workable test or approach by which to evaluate the acts. Courts have proceeded on a case-by-case basis, analyzing the nature of the governmental judgment to determine if a balancing of certain policy factors was involved. The activity will generally be immunized at the "planning level" but not at the "operational level." *American Exchange Bank of Madison v. United States,* 257 F.2d 938 (7th Cir. 1958). Exhaustive discussion of the discretionary function exception, including the planning/operational mode of analysis, appear elsewhere (see, e. g., *Blessing v. United States,* 447 F.Supp. 1160, 1167–1186 (E.D.Penn. 1978)), and need not be duplicated here.

The decision to build a reservoir and recreational areas at Shelbyville, Illinois, is not at issue here, for that clearly is a discretionary function. See *Miller v. United States,* 410 F.Supp. 425 (E.D.Mich.1976); *Hooper v. United States,* 331 F.Supp. 1056 (D.Conn. 1971); and *Konecny v. United States,* 388 F.2d 59 (8th Cir. 1967). Plaintiff contends that "once that decision was made, the government had a duty to use reasonable care to develop permitted swimming areas free from hidden dangers that could seriously injure persons. The decision to leave tree stumps in Lake Shelbyville occurred long after the government exercised its discretionary function in deciding to construct the reservoir and was, in fact, a decision made at the operational level of the project."

The facts reveal, however, that the decision regarding the policies and guide specifications for all corps clearing projects were promulgated by the corps' office of the Chief of Engineers, in Washington, D.C. These Guide Specifications, and a manual, Civil Works Construction in Clearing, were used by the St. Louis office in formulating the clearing plans for the Shelbyville Dam and reservoir. See pages 4–5 *supra.* No evidence supported the authority or discretion vested in any of the district level corps officials to vary from the Guide Specifications.

Here the decisionmaker, Corps' Office of the Chief of Engineers, was engaged in a planning function involving some considerations of public policy. The general engineering objective was "to clear only to the minimum extent required in order to effect an over-all reduction in construction costs, to clear areas that would otherwise create hazards to the primary project purposes, but not to clear to an extent which will create a maintenance problem from regrowth." The Corps weighed cost and engineering factors and arrived at a design decision that applied to all Army Corps' clearing projects at the time, not just Lake Shelbyville. This decision appears to be clearly within *Dalehite's* bounds of discretion which is entitled to immunity. This Court is thus without jurisdiction to consider portions of plaintiff's complaint based upon the decision to not require complete removal of submerged tree stumps from the area of Lake Shelbyville.

This does not, however, put an end to the essential thrust of plaintiff's complaint. Plaintiff asserted two additional acts or omissions: failure to prohibit diving by all persons in all swimming areas of Lake Shelbyville which contained submerged tree stumps; and failure to warn plaintiff of the existence of the hidden danger of submerged tree stumps in said swimming area of Lake Shelbyville. Neither of these acts or omissions are incident to the decision to leave stumps remaining in the lake. The defendant appears to concede that these are operational level decisions made by the District Engineer. See 36 C.F.R. § 327.5 and the "Project Safety Plan" and "Master Plan". I would have so found in any event based on my agreement with the decision in *Smith v. United States,* 546 F.2d 872 (10th Cir. 1976), that the decision not to give warnings must be examined separately in order to determine the applicability of § 2680(a). The Government cannot avoid its duty to warn by assimilating the decision whether or how to warn into another decision protected by the discretionary function exception. These decisions in the instant case are not within the exception.

### B. *Illinois Recreational Use Act*

The United States has waived its sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. § 2674, so that it may be held liable in the same manner and to the same extent as a private individual under like circumstances. The focus, therefore, is upon whether under Illinois law an individual landowner would be liable under the facts of this case. The United States contends that under the Illinois Recreational Use of Land and Water Areas Act, Ill. Rev.Stat. ch. 70, §§ 31–37 (Recreational Use Act) there is an applicable statutory limitation on liability.

The purpose of the Recreational Use Act, as set forth in Section 31 of the Act, is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability towards persons entering thereon for such purposes. With two exceptions, a landowner to whom the act is applicable owes no duty of care to keep the premises safe for entry or use by any person for recreational purposes, or to give any warning of the dangerous condition, use, structure, or activity on such premises to persons entering for such purposes (§ 33). The two exceptions are where there exists wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity, or for injury suffered in any case where the owner of land charges the person or persons who enter or go on land for recreational use (§ 36).

The definition of land in the statute includes the land area involved in this case to the extent it is a land or water area located outside the corporate limits of a city, village, or incorporated town. Swimming, fishing and water sports are included among the recreational purposes defined in the Act. Neither Stephens nor his companions paid an admission price or fee in return for entering upon the land on the day in question. The issue of willfulness or maliciousness will be discussed in a separate section of this opinion.

Plaintiff contends that the Recreational Use Act is inapplicable to this litigation both because of certain exceptions contained in the Act and because it has been superseded and modified by the Illinois Recreational Area Licensing Act (Licensing Act), Ill.Rev.Stat. ch. 111½, §§ 761–785.

■ First it is contended that the Act only provides protection to persons who open existing facilities to the public and not to owners who negligently design and construct lands specifically for recreational use. Nothing in the Act would support this interpretation, however, and it is not the province of a Court to engraft exceptions the legislature has omitted.

■ Secondly, plaintiff asserts that the exception in Section 35 of the Act applies. That section provides that the owner of land leased to the State may agree in writing that the statutory limitations on liability are inapplicable. The lease between the United States and the State of Illinois contains, at Section 10, an indemnity or "hold harmless" clause. Based on the inclusion of this clause, plaintiff argues that the Government was recognizing exposure to third party liability for failure to exercise ordinary care and impliedly invoking the exception of Section 35 of the Recreational Use Act. Initially, I must note that the lease was not introduced into evidence at the trial. In any event, the "hold harmless" provision is not sufficient to serve as a written agreement waiving the provisions of the Act and establishing the duty of ordinary care.

Third, plaintiff argues that even if the Act may have relieved the owner of the land from any duty of ordinary care to recreational users, the United States Government assumed the duty by promulgating its safety rules for Lake Shelbyville and making inspections. The rule of law tendered as applicable is that where a person undertakes an act, not otherwise required by law on his part, which, if not performed with care will subject persons to a danger, the law imposes a duty on that person to exercise ordinary care. The Recreational Use Act was intended to abrogate certain common-law duties of those covered by the Act. Sound public policy would support the encouragement of safety inspections by the owner or occupier without waiver of defenses under the Recreational Use Act. However, the Illinois Supreme Court has apparently adopted a stringent rule which rejects that public policy consideration in favor of imposing liability in analagous situations. In *Nelson v. Union Wire Rope Corporation*, 31 Ill.2d 69, 199 N.E.2d 769 (1964), the Illinois Supreme Court, interpreting Florida law, found that:

> [D]efendant did gratuitously undertake to make safety inspections and to render safety engineering services on the courthouse project, and that such inspections were planned, periodic and directed to the safety of the employees on the project. Under these circumstances, . . . it is our opinion that duty devolve[s] upon defendant, owed to the plaintiffs, to make its inspections with due care.

*Nelson* involved the liability of a workmen's compensation and public liability insurance carrier which was charged with the negligent performance of gratuitous safety inspections and safety engineering service. The *Nelson* opinion was accepted as the rule of law in Illinois in a diversity case by the United States Court of Appeals for the Seventh Circuit. *Stahlin v. Hilton Hotels Corp.*, 484 F.2d 580 (7th Cir. 1973). Illinois appellate courts have followed the *Nelson* decision and it apparently remains the rule of law in the State. *See Pioneer Hi-Bred Corn Co. v. Northern Illinois Gas Co.*, 16 Ill.App.3d 638, 306 N.E.2d 337 (3rd Dist. 1973); *compare Callaizakis v. Astor Development Co.*, 4 Ill.App.3d 163, 280 N.E.2d 112 (1st Dist. 1972).

A review of the actions of the United States Government reveals that their inspections were planned, periodic and in part directed towards compliance with safety regulations and detection and prevention of safety hazards to the public. The Government has cited no cases which would prevent the imposition of this common law duty based upon the negligent undertaking of safety inspections. Their only argument

is that the Recreational Use Act is analogous to the "good Samaritan" statutes wherein a party who undertakes to do an action in good faith and provides care without fee shall not, as a result of his acts or omissions (absent wilful or wanton misconduct on the part of such person in providing such care) be liable for civil damage. *See, e. g., Jeffries v. U. S.,* 477 F.2d 52 (9th Cir. 1973); *Roberson v. U. S.,* 382 F.2d 714 (5th Cir. 1967).

■ While the Recreational Use Act is obviously intended to limit the common law duties of due care ordinarily imposed on all landowners or occupiers, it cannot be exaggerated to the point of expressly or impliedly limiting liability for acts voluntarily undertaken. That is, whether the defendant was under no common law duty and acted voluntarily or whether he was originally under a common law duty which had been abrogated by statute prior to the undertaking, the resulting imposition of liability for voluntary inspections negligently performed seems to be the rule of law in Illinois.

Despite the fact that at least one Illinois appellate court has questioned the strength of *Nelson, see Callaizakis, supra* at 170, and the Illinois legislature has limited the effect it may have in the workmen's compensation area, *see* Ill.Rev.Stat. ch. 48, ¶ 138.5, this Court is still bound by the general rule absent an indication that the State's highest court is prepared to abandon or modify it. It is possible that the Supreme Court of Illinois would today find the defendant is not liable absent proof of reliance on its inspection measures by the injured plaintiffs. *See Hill v. U. S. Fidelity and Guaranty Co.,* 272 F.Supp. 569 (N.D.Fla.1967). In view of the possibility of recovery under this theory of Illinois negligence law, as well as for other reasons developed later in this opinion, a consideration of negligence, contributory negligence, and assumption of the risk will be necessary.

Fourth, the plaintiff contends that the act does not apply to persons who charge to use their property and that exception applies whether or not the particular plaintiff was charged. Section 36(b) of the Act states that the Act does not limit liability "[f]or injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof." Section 32 defines "person" to include "any person, regardless of age, maturity or experience who enters upon or uses land for recreational purposes." A literal reading of the statute could support the conclusion that the Act is not applicable here because some people using the park for recreational purposes paid a fee. There does not appear to be any specific legislative purpose or public policy in distinguishing between paying and nonpaying recreational users of a single land or water area. There does appear to be a clear purpose to distinguish between land and water areas which "charge" and those which do not. "Charge" is defined as the admission price or fee asked in return for invitation or permission to enter or go upon the land.

No Illinois State court cases have interpreted this statute. One Federal District Court has interpreted a similar statute in Wisconsin to distinguish between paying and non-paying recreational users. *Garfield v. United States,* 297 F.Supp. 891 (W.D.Wis.1969). That construction seems to be most consistent with a close reading of the statute and the Court should not sit in judgment upon the wisdom of the distinctions made.

Finally, plaintiff contends that the Licensing Act enacted by the Illinois legislature subsequent to the Recreational Use Act, is applicable to the defendant and precludes the protections otherwise available under the Recreational Use Act. This was the conclusion reached by Judge Prentice Marshall in *Miller v. United States,* 442 F.Supp. 555 (N.D.Ill.1976). Reading the two statutes *in pari materia,* the Court found:

The entire legislative scheme should be read *in pari materia.* When it is, it becomes clear that the Recreational Use of Land and Water Areas Act is intended for those who permit open lands to be

used recreationally on a casual basis. But those who hold their property out to the public for recreational purposes, and maintain their property for recreational use by the number of persons that are prerequisite to the application of the Recreational Area Licensing Act, they are subject to the provisions of the latter and not entitled to the asserted protection of the former. 442 F.Supp. at 561.

On May 9, 1979, the United States Court of Appeals for the Seventh Circuit affirmed the decision in *Miller v. United States,* 597 F.2d 614 (7th Cir. 1979). The Seventh Circuit discussed both the Recreational Use Act and the Licensing Act. The Court went on to hold:

> We agree with the district court . . . that the two statutes should be read *in pari materia,* and that the Recreational Use Act does not apply to areas such as the Crab Orchard facility that are primarily maintained for recreational use. Accordingly, the United States is not entitled to the protection of that act.

The holding in the *Miller* case applies equally well in the factual situation present here. In both cases the areas in question were primarily maintained for recreational use.

■ Under *Miller,* the Recreational Use Act is thus not available to the United States as a defense in this case. I have found that by undertaking to promulgate rules and make inspections the United States may be liable for negligence even if the Recreational Use Act was applicable. Finally, my finding of wilful and wanton conduct later in this opinion excludes the United States' actions or omissions, even absent the *Miller* rationale, from the Recreational Use Act's protection.

### C. *Negligence, Contributory Negligence, and Assumption of the Risk*

■ The four classic elements necessary for a cause of action for negligence are: legal duty, breach of duty, causal relation, and damages. Initially the Court must determine the existence of a duty and its scope.

In this case the defendant United States is the owner of the land and water area which is the subject of this lawsuit. At the time of the accident the property had been leased to the defendant State of Illinois. The duties owed here are those owed by an owner of land and those owed by an individual who undertakes an inspection which, if not performed with care, will subject persons to a danger.

■ The owner or occupier of land has varying duties depending to a great extent on the conduct and status of the injured person. Generally the rule is that invitees are owed the duty of reasonable care, that is, the care which a reasonable man would exercise under similar circumstances. A person must take reasonable care to avoid acts or omissions which he can reasonably foresee would be likely to injure his neighbor. It is sometimes stated that it is the likelihood of injury that gives rise to the duty to exercise due care.

■ After the owner leases the property the extent of his continuing duty depends upon several factors. It is clear that the owner must disclose to the lessee any concealed conditions or the creation of any dangerous conditions on the property. The duty of the owner for ordinary care must persist at least until the conditions are divulged, or reasonable time has passed for discovery, and there has been time for appropriate corrective action or warning to be instituted.

The defendant asserts that "under common law negligence standards a landowner is ordinarily under no duty to warn an invitee of a danger that is outside the scope of his invitation and is open and obvious, or readily discoverable." The questions of obviousness or discoverability of a danger border on the two companion issues in most negligence actions; contributory negligence and assumption of the risk. Those aspects of this case will be discussed separately.

■ Whether the duty considered is that of an owner of land or of an inspector of the land, the United States Government

breached the duty in this case. This is not a situation where the defendant could or should have known a dangerous condition on the property; rather, the defendant had actual knowledge of the stumps through promulgation of the guidelines and contract allowing 6″ stumps to remain in the lake bottom and by visual observation by several rangers prior to impoundment or during low water periods. The defendant also knew that the land would be used by the public after it was leased. With this knowledge and the right of inspection and control exercised, did the defendant act as a reasonable man under the circumstances? The answer is no.

What did the United States Government do or not do which leads to a conclusion of breach? It is beyond the realm of common sense for the Government to contend that of the 3,000,000 annual visitors which visit Lake Shelbyville each year there are not many who dive and swim in different areas of the lake, including Eagle Creek State Park. In view of defendant's knowledge of the stumps and the obviously serious harm which would befall a swimmer or diver striking such a stump, plaintiff suggested several options defendant could have used to comply with its duty as a reasonable person.

First of all it could have prevented swimming or diving in all portions of the lake except an area where it was ascertained to be safe. Defendant argues that it was the knowledge of the State of Illinois personnel at Eagle Creek State Park that swimming was prohibited throughout the park. The defendants' regulations as well as the State of Illinois' regulations said that swimming was prohibited only where posted. What posting was there or what communication was there to the public of the rangers' understanding? No signs pertaining to swimming or diving were made or posted in Eagle Creek State Park by the United States Government. Evidence shows at most thirteen signs pertaining to swimming were ever made by the State of Illinois. These were to serve both Eagle Creek and Wolf Creek State Parks. Two rangers patrolling the Park only remember two signs

in Eagle Creek State Park and those were at the boat dock and dam area.

If the number of signs alone is not conclusive, where was the placement? Here there was only one entrance to the Park. The road came into the Park from the west and curved at about a ninety degree angle to the south. There were no signs at the front gate and entrance except "Welcome to Eagle Creek State Park." There were no signs as far as the first turnoff from the main road which is where plaintiff and his friends stopped. There were no signs pertaining to swimming or diving from where they parked the car to where they arrived at the water's edge. There were no signs at the water's edge. The only two signs in Eagle Creek State Park were located miles from the cove where the accident occurred.

The cautionary statements made in the defendant and State of Illinois pamphlets were not printed or distributed in a manner in which the public was adequately informed of the danger involved.

Alternatively, the Government could have warned of the danger of submerged stumps along the shoreline. The only warning of this nature appeared in a brochure which was distributed only to persons who camped and paid a fee. This warning again evidences the knowledge of the United States of the stumps and their potential safety hazard.

■ It is not for the Court to say as a matter of law what is enough to satisfy a duty, rather it must be judged in each fact situation whether the standard of ordinary care is met. Here the Government did not conduct itself as a reasonable person under the circumstances. This applies equally well to efforts made or not made as a result of safety inspections performed by the rangers in compliance with the various federal regulations and project plans.

■ Having established a duty, and breach, the Court must next turn to the issue of causation. The plaintiff has the burden of introducing evidence which supports a conclusion by the trier of fact that it

is more likely than not that the conduct of the defendant was a substantial factor in bringing about the resulting injuries. This causal sequence may be inferred from circumstantial evidence, expert testimony or common knowledge. If the causation in fact can be found the Court must consider the issue of proximate cause, or whether the defendant should be legally responsible for what he caused.

The causation in fact question presented here is whether "but for" the defendants' negligence in failing to adequately warn of the presence of stumps or completely prohibiting swimming in the area, the defendant's accident would not have occurred. I have no problem finding that defendant's negligence was a cause in fact of plaintiff's injury providing, of course, that what he struck was a stump. Defendants contend that plaintiff has not established that he hit a stump as opposed to a stone, a piece of cut wood or a submerged waterlogged log resting in the lake bottom. An analogous situation was decided in *Sherman v. City of Springfield*, 111 Ill.App.2d 391, 250 N.E.2d 537 (4th Dist. 1969), where the only direct evidence pertaining to the cause of a diving injury was plaintiff's testimony that his head hit something hard. The dispute here, as in *Sherman*, is identifying the "something hard."

From the evidence I have concluded that it is more probable than not that plaintiff hit one of the submerged tree stumps which had been cut during the clearing operations for Lake Shelbyville.

The evidence revealed that the object had to be narrow enough to go between the diver's outstretched arms yet solid enough to stop him dead in the water and cause the severe injuries which resulted. Dr. Molitor opined in his deposition that based upon the nature of the injuries, plaintiff struck a blunt object rather than a sharp object. Dr. Molitor, who had a great deal of experience recreating at Lake Shelbyville, gave his opinion that the injury was not caused by a floating object hit under the water's surface. He has not seen many rocks at Lake Shelbyville.

Defendant's own evidence tends to prove that it was more likely a stump than anything else. If there was anywhere near the number of stumps at the elevations as appeared on the aerial photograph taken prior to the accident, and on the land survey 3½ years later, the probability was extremely high that a diver would hit a stump. In addition, the defendants showed no large stones or objects in the area which would have caused such an injury. The totality of the circumstances convinces me that the plaintiff's head hit a submerged tree stump.

 Contributory negligence is a doctrine under which a plaintiff is barred from recovering if his own conduct was a proximate cause of his injury, even though the defendant's actions may also have been a proximate cause. To avoid contributory negligence a plaintiff is required to conduct himself as would a reasonable man under the circumstances.

The question then is whether the plaintiff acted as a reasonable man under the circumstances. Defendants' primary assertion is that plaintiff dove into murky water without ascertaining, or making an effort to ascertain, whether it was reasonably safe for diving. In addition, it is contended that the condition of the shoreline and the presence of stumps thereon should have made plaintiff aware of possible danger.

It is not disputed that plaintiff was an experienced swimmer and had received Red Cross swimming instruction which included water safety. The cove in question was not a developed or guarded swimming area so this increased the responsibility on Stephens to check out the area before swimming or diving. I have previously concluded that swimming was allowed in this area since there was not sufficient communication of any rule or regulation to the contrary. Additionally, I have found that while there were stumps along the shoreline they were concealed by various densities of vegetation.

Plaintiff contends that he and his companions were swimming and wading in the general area where he dove in prior to the

accident. Based on their wading in and swimming, he contends this formed a reasonable basis for his conclusion that no hazards were present.

Much is made of the fact plaintiff "dove" in at the time of the accident rather than wading in and commencing swimming. The dive here was the act of Stephens pushing from shore and extending out over and into the water. He was not springing from any elevated diving boards or objects.

■ After considering all of the facts, I must conclude that plaintiff was contributorily negligent to some degree. Since Illinois is a contributory as opposed to comparative negligence state, any degree of contributory negligence will prevent recovery for the defendants' negligence.

The area in which plaintiff chose to swim and dive was not a developed area for those activities. Because of the proximity to a small group camping area and some type of path leading to the cove, it is inferable that recreational users did use the cove with some regularity. However, it was not established to be any type of known "swimming hole" which would indicate safety to a reasonable person. Rather, it was at the edge of a heavily forested area, with vegetation along the shoreline. The rustic and natural setting provided an enjoyable place for certain forms of recreation. It is foreseeable, however, that there may be underwater hazards and there was simply no indicia in this case that would negate that possibility. Although the three people swam and waded in the general area during the afternoon, there were still risks involved in diving into this water. See, e.g., *Sommer v. City of Taylorville*, 59 Ill.App.3d 765, 16 Ill.Dec. 924, 375 N.E.2d 1031 (5th Dist. 1978).

■ The United States has also raised the defense of assumption of the risk. This defense is separate and distinct from contributory negligence. Contributory negligence is measured by the objective standard of a reasonable man under the circumstances. "Assumption of risk involves conscious exposure to danger, consent to or the deliberate decision to encounter a known risk, the willingness to take a chance; it is more subjective than objective; assumption of [the] risk is an affirmative defense which must be pleaded and proved by the defendant." *Sweeney v. Mathews*, 94 Ill.App.2d 6, 236 N.E.2d 439 (1st Dist. 1968).

■ The record does not support a knowledge, understanding or appreciation of the danger which satisfies a finding that plaintiff assumed the risk. At most plaintiff's actions were careless in view of the circumstances. He certainly did not know there were stumps in the area in which he dove or swam.

### D. Wilful and Wanton

■ The law recognizes different degrees of negligence, with the amount of care demanded by the standard of reasonable conduct changing in proportion to the apparent risk. As the danger becomes greater, the actor is required to exercise caution commensurate with it.

■ The conduct in question is the failure of the United States to warn the public of a dangerous condition of submerged tree stumps which it knew existed in Lake Shelbyville. It is necessary for the Court first to determine what the proper test for wilful conduct is under Illinois law. There is no doubt that mere contributory negligence will not prevent liability for wilful and wanton conduct, neither will the Recreational Use Act discussed earlier in this opinion.

Plaintiff contends that the failure to warn others of a dangerous condition about which in the exercise of reasonable care an owner knows or could have known constitutes wilful negligence. The basis for this standard is derived from the Illinois Structural Work Act, Ill.Rev.Stat. ch. 48, §§ 60–69, which provides a right of action to injured persons for any "wilful violations" of the Act. Judge Marshall, in *Miller v. United States*, 442 F.Supp. 555 (N.D.Ill.1976), accepted this definition as applicable to the Recreational Use Act. In *Miller*, the Court found the United States liable for injuries

sustained by the plaintiff when he dove off of a dock into shallow water at a Government wildlife refuge. There it was found that the Government wilfully failed to guard against or warn users of the dangerous condition at the end of the dock (shallow water level) since it could have discovered the condition in the exercise of reasonable care.

Defendant argues that the definition of "wilful" within the Recreational Use Act is not to be construed as the same as language under the Structural Work Act. "Mere knowing" is not felt to be sufficient to support an award of damages for which a showing of wilful and wanton is necessary. According to the Government's interpretation in order for a Court to find a "wilful" or "malicious" failure to warn of a dangerous condition, a Court must find affirmative evidence from which an inference of conscious indifference to the consequences might be drawn. Also suggested as a definition is that set forth in *Schneiderman v. Interstate Transit Line, Inc.*, 394 Ill. 569 at 583, 69 N.E.2d 293 at 300 (Ill.1946):

> A willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care.

Finally, the Government suggests it was not under a duty to warn of an open and obvious danger which the plaintiff in conscious disregard of his own safety failed to recognize and heed.

■ The key under any of these "tests" is (1) the foreseeability of the danger, its probability and gravity of harm; (2) the knowledge of the defendant of the danger; (3) the actions which the defendant took in view of the first two factors. I am convinced that no spirit of ill will or intentional misconduct is essential to prove wilfulness. Rather it is conduct which takes on the

aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. If such conduct is found, the plaintiff is entitled to recovery even though certain defenses would have prevented his recovery for ordinary negligence.

In my opinion this is not a "reasonably could have known of the danger" case. The Corps allowed the contractor who cleared the land to leave stumps to a height of 6″ all over the reservoir area. Depending upon the water level the stumps would be exposed or submerged. From the pictures admitted into evidence at trial it appears the shorelines, including at the site of this accident, were dotted with large numbers of tree stumps. The Corps of Engineers employ reservoir rangers to patrol all Government land, including the land in question. These inspections included observation of visitor land and water safety hazards and adequate safety signing. At least two of the Corps rangers knew of the tree stumps on the lake. The rangers also knew that thousands of visitors came to the lake each day for various forms of recreation. They further realized that stumps and underwater hazards posed serious safety dangers to swimmers or divers.

■ The Government contends that their duty is less because the lake's primary use was not recreation. However, the Corps of Engineers own Resource Management Plan for Lake Shelbyville states: "The great majority of the using public view Lake Shelbyville as a recreational development." Resource Management Plan, App. A, p. 4, § 2.4. It is obviously foreseeable that visitors would engage in all types of water activities unless they were warned or otherwise prohibited. It strains credibility to think thousands of people were not swimming along the shores of the lake and that corps rangers did not know of this activity. In the prior portion of this order dealing with negligence I have concluded that in view of the obvious danger the stumps posed, the Government failed adequately to warn of the stumps or prevent swimming or diving. The Government has

entered the area of providing recreation facilities for the public. This is a worthwhile function. However, when the Government provides, and encourages the public to enjoy such facilities, it must adequately inform the people of the dangers and liabilities involved.

Did the Government's conduct rise to the level of wilful or wanton? Certainly in view of the circumstances the risk to swimmers would be great and to divers even worse. The probability of harm and gravity of injury would be great. However, defendant asserts that there were ·no prior reported incidents of personal injury relating to a stump. In my opinion this simply means it took five years for the inevitable to happen. The aggravated negligence demonstrated by the Government in this case should not be lightly tolerated. It is true that there were some stumps along the shore, but because of the various degrees of vegetation covering them they did not in any way impress on a recreational user the virtual picket fence of submerged stumps which exist through some portions of the lake. On a beautiful summer day these young people went to this cove and engaged in activities which were lawful. Because the water was murky, near a forested area, and not a regular swimming place, I found that plaintiff was negligent for diving into the water. But there is no way that his actions should defeat recovery for the utter indifference shown by defendant regarding a severe safety hazard posed for recreational users.

The extreme risk and gravity of harm is shown to be even more aggravated when balanced against the ability of defendant to make people aware of the dangers. Evidently, they considered the harm sufficiently dangerous to warn paying campers about the fact "[s]ubmerged stumps, logs, and rocks are present in the lake." Plaintiff's exhibit 3. This simple warning, or a general prohibition of swimming or diving, would have apprised the individual of this vital information known to the Government, but not necessarily by the recreational users.

In summary, we are not dealing with some object which the Government had no control over or about which it was unaware. Plaintiff hit a tree stump which the Government allowed to remain and failed to warn of its presence. In view of the Government's knowledge, the probability and gravity of harm, the total failure to warn, the ease in which a warning could have been made, and the failure of the Government's conduct to rise to any level which should be tolerated, I find wilful and wanton misconduct as determined by the law of the State of Illinois.

A status call will be held on Wednesday, May 30, 1979, at 1:15 p. m. to determine a trial date on the issue of damages.