**Angel ROSA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 82–0957.**

United States District Court, M.D. Pennsylvania.

Feb. 25, 1985.

470

Timothy D. Sheffey, Egli, Reilly, Wolfson, Sheffey and Schrum, Lebanon, Pa., for plaintiff.

Barbara L. Kosik, Asst. U.S. Atty., Scranton, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Plaintiff filed the captioned action on August 6, 1982, seeking wrongful death and survivors' benefits in the death of eight year old Maria Rosa. This court, sitting without a jury, heard testimony from both parties in a trial which commenced October 16, 1984. Upon consideration of the record

before it, this court finds the defendant liable in the death of Maria Rosa.

*Discussion*

### Factual Background

Blue Marsh Lake, located in the Schuylkill River Basin, Tulpehocken Creek, Leesport, Berks County, Pennsylvania, is property owned by the United States and administered by the Army Corps of Engineers. In October, 1962, pursuant to the provisions of the Rivers and Harbors Act, 33 U.S.C. § 426e–426g and the Omnibus Flood Control Act, 33 U.S.C. § 701, *et seq.*, Congress approved implementation of the Blue Marsh Lake Project. The Project, completed in 1980, is designed primarily to assist flood control and to enhance the quality and quantity of water supplied throughout the western sector of Perks County. In addition, designated areas incidentally created by and not devoted to these purposes are made available to the public for recreational use.

The principal day-use facility, known as the Dry Brooks Recreation Area, is situated on approximately sixty-six acres of land bordering the northeast shore of the Lake's main lower section. A boathouse, concession stand and beach area are all available for use by the public. No fee is charged for admission to the Dry Brooks Recreation Area, or for use of the available facilities.[1] The designated swimming area consists of a shallow pool with a maximum depth of five feet. This area is marked off by orange buoys. Surrounding the designated swimming area is another area marked off by white buoys, referred to as the no boat zone. Water depths increase substantially. The area beyond the white buoys is referred to as the boat zone.

Several differences between the designated swimming area and the boat zone are significant to this litigation. In the designated swim area, the water depths are shallow and increase only gradually. Even at a distance of eighty (80) feet from shore, the water depth would not exceed five (5) feet. The lake bottom is packed and fairly uniform. In contrast, in the boat zone (the area beyond the white buoys) the bottom is not packed; the surface is rocky and uneven. Water depths increase rapidly. The depth reaches five (5) feet at a distance of twenty-five (25) feet from shore. At a distance of seventy-five to eighty feet, the depth would be ten feet, or twice that of the designated swim area at a similar distance from shore. The uneven lake bottom makes it difficult to determine water depth in any given area. On a busy day when many people are in the lake, the water becomes muddy, making it even more difficult to determine water depth.

Beach regulations are posted in the park area. The regulations provide, in part, that swimming is at one's "own risk," *see* 36 C.F.R. § 327.5 (1982); that for one's own safety, persons using the facilities should "remain inside the orange-zoned area" as "depths increase beyond," and that "inner tubes are prohibited" within the designated swimming area. Swimming outside the designated area is permitted but swimming at boat launch sites is prohibited. There were no signs which indicated the actual water depths in the area beyond the white buoy.

The park manager at Blue Marsh Lake was Albert Schoenebeck. Mr. Schoenebeck is a graduate of Penn State University with a degree in Park and Recreation Administration. Following graduation, he spent ten (10) years working as an assistant park director. In May of 1979, he was hired by the Army Corps of Engineers as the first and only park manager at Blue Marsh Lake.

As park manager, Schoenebeck supervised a staff of park technicians. These technicians would patrol the park, oversee the beach area and enforce park regulations. They received several days of training at the beginning of their employment. This training would include a Park Technicians' Manual drafted in part by Schoenebeck. No lifeguards were employed at the

---

1. Defendants state, and it is not contested, that the concession stand is leased to a private business. Food and beverages are available for those who wish to purchase them.

park. However, it appeared from the testimony that those technicians who patrolled the beach area had training in lifesaving. It is not clear from the record whether such training was a requirement for employment.

Blue Marsh Lake was very busy on summer weekends. In an effort to control crowds when the parking lot was filled to capacity, technicians on duty would close the gates to the park. This action was not effective in controlling the crowds, since those wishing to use the lake would park outside the gates and walk in. No efforts were made to discourage this practice. Sunday, June 28, 1981 was such a day. Schoenebeck estimated that approximately 1800–2800 persons used the facilities of the Dry Brooks Complex at Blue Marsh Lake on that day.

On June 28, 1981, eight year old Maria Rosa went to Blue Marsh Lake with an older brother, Andres, age 13, two sisters, Elizabeth, age 14 and Madolyn, age 9, and two adult family friends. Specifically, the group went to the Dry Brooks Complex. Maria Rosa was a nonswimmer. Andres and Elizabeth could swim only to a limited degree. The children took with them two innertubes.

During the course of the afternoon, Maria's brother Andres and her sister Elizabeth took the innertubes into the designated swimming area (the area within the orange buoys). Maria was with them. Andres testified that while in that area, he walked to the end of the orange buoy. He got off the innertube and while the water came up to his chin he was able to walk on the sandy bottom of the lake. Andres was, by his own recollection, about five feet, five inches tall at that time.

A short time later, Kathy Grimm, a uniformed park attendant and an employee of defendant United States of America, got the attention of the Rosa children and told them that the rules of Blue Marsh Lake prohibited them from using innertubes within the designated swimming area. That uniformed employee went on to instruct the children that they could move down the beach and use their innertubes in the boat zone (the area outside the white buoys). Maria was present during this interaction with the park attendant.

The children followed the instructions given by the park attendant. They left the water, and returned to the beach for a short time. They then went to the boat zone (the area beyond the white buoys) in keeping with the instructions they had been given, and took their innertubes into the water. The children went out to about the same distance from shore as they had been while in the designated swimming area. Other people were standing in the water near them. While playing with her brother and sister, Maria Rosa attempted to jump from one innertube to another. She slipped from the tube and into the water. Unable to swim, she quickly sank below the water's surface. Elizabeth felt Maria's hand under water and grabbed it. Maria then slipped from her sister's grasp and could not be found again.

At approximately 4:40 p.m., a park technician was alerted that Maria had disappeared under water. The technician radioed the Park Manager who, in turn, notified the local police and ambulance company. Park technicians then assembled a human chain of rescue volunteers and began repeated searches in the area where Maria was reported to have disappeared. At approximately 4:49 p.m., the police arrived. At approximately 4:50 p.m., Maria was found by a volunteer about 15 yards from the shore in water about ten feet deep. The police immediately began to administer CPR as Maria was carried to shore. She was transported by ambulance to Reading Hospital. Maria never regained consciousness and died on July 1, 1981 while undergoing intensive care.

There were two sets of regulations in effect at Blue Marsh Lake in June of 1981, "Beach Regulations" and "Area Regulations." Typically, these regulations were displayed together. They were posted in the bath house (four locations), at the food concession stand (one location), and on a wooden kiosk or information center (beach

regulations only). That kiosk, a roofed structure approximately four feet by four feet, was located about midway between the concession stand and the beach, a total distance of about 100–120 feet. There was some testimony that signs were also posted in the parking and picnicking areas. The signs were printed in English only.

The beach regulations in effect in 1981 provided:

1. SWIMMING BEYOND NO–BOAT–ZONE BUOYS IS PROHIBITED. FOR YOUR SAFETY, PLEASE REMAIN IN SHALLOW ORANGE ZONE; DEPTHS INCREASE BEYOND.

2. BUOYS, BALLS, AIR MATS, FLOATS, FRISBEES ARE NOT PERMITTED. U.S. COAST GUARD APPROVED FLOTATION DEVICES ARE ALLOWED.

Plaintiff's exhibit # 4.

In practice, Schoenebeck said these regulations were not strictly enforced. Swimming was allowed in the no boat zone at the flanks of the designated swim area. The prohibition was enforced only in the area facing the center portion of the lake, where swimmers would come in contact with boaters. Similarly, the prohibition relating to inflatables and other flotation devices was not enforced as stated. Rather, it was only enforced in the designated swimming area.

Schoenebeck testified that he drafted the rules in force at Blue Marsh Lake but that those rules had to conform to the national policies of the Army Corps of Engineers. However, the Corps of Engineers had no established policy on the use of innertubes. That particular regulation, as it existed at Blue Marsh Lake, was developed by Albert Schoenebeck in his position as park manager. He testified that he used his professional judgment in drafting the regulation and that its purpose was to prevent horseplay in the swim zone.

Schoenebeck further testified that he was familiar with a text prepared by the American Red Cross entitled *Lifesaving:* *Rescue and Water Safety* which reads in part,

Nonswimmers require a considerable area of shallow water. They should not venture into water beyond shoulder depth. They should resist at all times the temptation to go beyond this depth with artificial supports such as air mattresses, inner tubes ... or beach balls or on the shoulders of a swimming companion. If the unexpected happens and the nonswimmer loses his support, the ability to regain the shore is also lost. Nonswimmers should not use flotation devices in any locations where they would not be comfortable and safe without them.

Weak or novice swimmers must confine their activities to areas in which they may be quickly and easily reached if anything goes wrong.

P. 17–18.

Of particular significance in this case is Schoenebeck's testimony regarding a survey he conducted in the summer of 1980. Schoenebeck surveyed innertube users at Blue Marsh Lake, primarily at the boundary between the boat and the no-boat zone areas, flanking the swim zone. In that survey of approximately 150 persons, Schoenebeck learned that about 70% of the innertube users were poor to non-swimmers. The results of the survey make it clear that, in addition to his familiarity with the opinion of generally accepted authorities such as the Red Cross, by the end of the summer of 1980, Schoenebeck had actual knowledge that a serious question existed as to the continued safe use of innertubes. However, in Schoenebeck's view the problem was the conflict between innertubes and boaters rather than the danger to non-swimmers.

Testimony was offered by of Dr. Ralph Johnson, an expert in water safety. Dr. Johnson testified as to the risks inherent in the use of innertubes. There is a particular danger to non-swimmers who, by the use of innertubes, have support in water depths where they otherwise would not be. When support is lost, the non-swimmer is

in immediate distress. According to Dr. Johnson, it is the prevailing opinion in the industry that the use of innertubes should not be permitted in outdoor facilities. He further testified that a park manager has two options available which would limit that inherent risk. At a minimum, the use of innertubes should be limited to the shallow water of the designated swim area. However, the better solution is to prohibit their use completely.

Plaintiff's expert further testified that in his opinion Albert Schoenebeck, based on his prior experience and training, should have realized the danger created by the existing innertube policy and should have taken action to eliminate that risk. Dr. Johnson was presented with the rule then in effect at Blue Marsh Lake which prohibited tubes in the no-boat zone but permitted their use in the boat zone. He was asked to offer his opinion as to what Schoenebeck knew or should have known about its continued enforcement. It was his opinion that based on Schoenebeck's experience—including the 1980 survey—he should have known that there was a potential for accidents and that, especially on a crowded day, all floats should have been ordered off the lake.

Dr. Johnson was also asked to offer his expert opinion as to the relationship, if any, of the innertube rules as enforced at Blue Marsh Lake, as well as the actions of the female park attendant to the death of Maria Rosa. He testified that the innertube rule and its enforcement was one of the most significant factors in Maria's death. Once she was in water over her head, her chance for survival decreased. The interaction with the park employee further increased the risk of harm. In the opinion of Dr. Johnson, this was the most important factor because once Maria was told to take the device outside the white buoy area, she was in water over her head. This interaction was, in the expert's opinion, the final factor in the sequence of events which caused Maria's death.

Andres Rosa testified that on the date of Maria's accident he and his sisters were using innertubes in the designated swim area. A female park technician blew a whistle and indicated that they should take their tubes and leave that area. Andres testified that the technician told him and his sisters that they were not to use innertubes in the swimming area but that they may use the tubes outside the white buoy area. He further testified that the technician did not ask if the children could swim, nor did she warn them about the water depths. He and his sisters returned briefly to shore and then Andres, Elizabeth and Maria took their innertubes to the area outside the white buoy as instructed by the park technician.

The female park attendant on duty that day was Kathy Grimm. Ms. Grimm testified that she spoke with many people while patroling the park; however, she could not remember any specific interaction with the Rosa children. She did testify as to the procedure she habitually followed upon finding someone using innertubes in the designated swimming area. Typically, she would call that person out of the water, explain the rules and ask that the tubes be removed from that area. She would often tell them to take the tubes to an area outside the orange buoys, sending them down the beach to the boat zone where the tubes were permitted.

This practice was corroborated by the testimony of another park technician, John Cave. According to Cave, during the summer of 1981 the use of inner tubes was permitted outside the white buoys. If he observed someone using an inner tube within the designated swim area, he would instruct that person to move to the area outside the white buoys. He did not inquire whether that person could swim.

## Findings of Fact

The parties have stipulated to certain undisputed findings of fact which are part of the record before this court and which are incorporated herein by reference. The court makes the following additional findings:

1. Schoenebeck was familiar that the American National Red Cross teachings re-

quire lifeguards to be used at public swimming areas.

2. Although familiar with the teachings of the American National Red Cross and with the American National Red Cross publication, *Lifesaving*, and recognizing that publication as an authority in the area of water safety, Schoenebeck ignored its precepts concerning non-swimmers and the use of inner tubes and floatation devices.

3. A short time after entering the orange float area (designated swimming area) with the inner tubes, a female park employee, in uniform, got the children's attention and told them they were not permitted to use the inner tubes in that area, and that they could only use them in the area beyond the white floats (the boat zone).

4. As a result of this direction and instruction from the uniformed park employee, the children, relying upon what they had been told, left the orange float area, and, a short time later, began using the inner tubes in the area beyond the white floats, but immediately adjacent to them.

5. This park employee did not tell the children about the increased water depth in this part of the boat zone, nor did she ask of the children whether they could swim, nor did she inquire about any adult supervision.

6. A short while later, at approximately 4:30 p.m., the children were on inner tubes approximately thirty to forty-five feet from the beach, and Maria Rosa jumped from the inner tube upon which she was riding to the other innertube. When she jumped, Maria Rosa reached the other inner tube but her grasp slipped; she fell into the water and disappeared under its surface.

7. Maria Rosa was treated at the Reading Hospital and Medical Center from her admission on June 28, 1981, until the time of her death on July 1, 1981.

8. The cause of death of Maria Rosa was hypoxic encephalopathy due to drowning. The immediate cause of death on July 1, 1981 was the cessation of heart function.

9. At the time of her death, Maria Rosa had a life expectancy of an additional 66.85 years, and a work life expectancy of 47 years.

10. After slipping beneath the surface of the water, Maria Rosa was conscious for a period of thirty seconds to three minutes. During that time, she inhaled water and suffered a choking spasm. Her air supply was cut off.

11. While under the water, and conscious, Maria Rosa would have been in a struggle driven by fear and an inability to breathe until she lapsed into unconsciousness from which she never recovered.

12. Immediately prior to June 28, 1981, Maria Rosa was in excellent health and had no serious medical problems.

13. Maria Rosa had finished the first grade in public school, and, although she had some problems, she had shown the typical progress expected for a first grader and was at or almost at grade level in most subjects. She was well-behaved, well-mannered, outgoing, got along well with her peers, and could be very cooperative and helpful.

14. Maria Rosa performed regular chores around the house, got along very well with her siblings and had close family ties with her parents and showed genuine expressions of love with her family. She could speak English and Spanish.

15. She lived with her parents, Angel Rosa and Juanita Rosa.

16. Angel Rosa wanted, desired and expected Maria Rosa, and his other children, to at least complete high school.

*Discussion*

Plaintiff alleges liability on two grounds. First, pursuant to the Pennsylvania Recreation Use of Land and Water Act, 68 P.S. § 477–1 *et seq.*, he asserts that the United States of America willfully failed to guard or warn against a dangerous condition, use or activity, with respect to Maria Rosa at Blue Marsh Lake on June 28, 1981. In an order dated October 27, 1983, this court ruled that the Pennsylvania statute was applicable to the instant case. The Act

relieves an owner of land from liability for negligence where that land has been made available to the public for certain recreational purposes. 68 P.S. § 477–3. The landowner is not relieved from liability, however, where he has *willfully* failed to guard or warn against a dangerous condition or activity. 68 P.S. § 477–3.

Plaintiff's second allegation of liability is grounded in the Restatement of Torts Second, Section 323. That section has been accepted by the Pennsylvania Courts. *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978); *Riddle Memorial Hospital v. Dohan*, 504 Pa. 571, 475 A.2d 1314 (1984). The principle has been held specifically applicable to the United States. *Blessing v. United States*, 447 F.Supp. 1160, 1187 and fn. 38 (E.D.Pa.1978). Section 323A provides that one who undertakes, whether gratuitously or for consideration, to render services to another is held liable for negligent rendering of those services if the negligence causes injury either to the person on whose behalf the services are being performed or to a foreseeable third party.

The court finds the Government liable under both theories.

## Willful Failure to Warn

The term "willful" is not defined in the Pennsylvania Recreation use of Land and Water Act. Thus, its precise definition is left to the courts. In *Wehr v. Burroughs Corp.*, 619 F.2d 276 (3d Cir.1980), the Court of Appeals was required to define "willful" in the context of an age discrimination statute. After an extensive review of the difficulties courts have had in defining this term, the court found "willful" to mean an act done voluntarily or intentionally or knowingly, as distinguished from accidental conduct.

In *Saaybe v. Penn Central Transportation Company*, 438 F.Supp. 65 (E.D.Pa. 1977), the district court defined "willful" to mean that an actor desired to bring about the result that followed, or at least that the actor was aware that the result was substantially certain to follow. 438 F.Supp. at 69 fn. 6. Actual prior knowledge must be found before the actor may be held liable

for willful conduct. *Id.*, citing *Evans v. Philadelphia Transportation Co.*, 418 Pa. 567, 212 A.2d 440 (1965). The *Saaybe* court further held that the critical element in any determination of willful conduct is whether or not the actor had reason to know of the risk of harm created by his conduct, 438 F.Supp. at 69 fn. 6. If the evidence shows that the actor had reason to know his conduct created an allegedly unreasonable risk of harm, whether because of general or specific information and knowledge, or from any findings or warnings regarding the hazardous nature of the activity, that evidence will support a finding of willful misconduct.

Plaintiff directs the court to Prosser, *Handbook of the Law of Torts*, West Publishing Company, 4th Edition, 1971, pp. 184–186. Dean Prosser advocates an objective standard defining willful conduct as highly unreasonable conduct or an extreme departure from ordinary care in a situation where a high degree of danger is apparent. Liability should be found if it is clear from the facts that the actor, whatever his state of mind, has proceeded in disregard of a high degree of danger, either known or apparent to a reasonable person in the actor's position. The standard put forth by Professor Prosser was accepted in the case of *Stephens v. United States of America*, 472 F.Supp. 998 (C.D.Ill.,1979), a case which involved the liability of the Army Corps of Engineers. In *Stephens*, trees were cleared to develop a recreational lake leaving stumps about six inches high. According to Corps policy, swimming was permitted throughout the lake which was thus created. The Corps did not post signs nor give any other warnings about the location of the stumps or prohibiting swimming or diving. In considering the Corps' liability under a statute similar to the Pennsylvania law at issue here, the court defined "willful" to include three elements: (1) foreseeability of the danger; (2) defendants' knowledge of the danger; and (3) the actions taken by the defendant in light of the first two factors. The *Stephens* court found that the Army Corps willfully failed

to guard or to warn against a dangerous activity, use or condition.

Finally, in *Davidow v. United States of America*, 583 F.Supp. 1170 (W.D.Pa.1984), the district court found the Army Corps of Engineers liable for a willful failure to warn or to guard against a dangerous condition, in violation of the Pennsylvania Recreation Use of Land and Water Act. The case involved a combination flood control and recreational project under the control of the Army Corps of Engineers. Several peninsulas penetrated the lake, one of which was known as a dangerous area and a navigational hazard for boaters because of severely restricted visibility. A danger buoy had been located at the point of this peninsula for about four (4) years. The buoy floated upstream in 1978 and was not replaced in either the 1978 or 1979 season. In September, 1979, two boats collided off the point where the danger buoy had been located. Without providing a specific definition for "willful", the court found that the failure to maintain the buoy was a willful failure to guard or to warn, in violation of the Pennsylvania Recreation Use of Land and Water Act.

■ In the instant case, the Army Corps knew that a dangerous condition existed. It knew the design of the lake. It knew that the floor of the lake in the area beyond the white buoys was rocky and uneven and that depths increased there dramatically. The Corps also knew that such an area is dangerous to non-swimmers who need to be close to shore, in shallow depths to avoid the risk of drowning. It should have known that water safety experts consider the use of innertubes a dangerous condition in facilities of this kind. Finally, the Corps knew, based on Al Schoenebeck's study, that 70% of those who used innertubes at Blue Marsh Lake were poor to non-swimmers. Yet the Corps took no action to prevent or to correct the danger inherent in this condition. Although its own rules prohibited the use of innertubes, the Corps continued its policy of non-enforcement, except in the swimming areas. Finally, the Corps permitted and actually encouraged use of the tubes in the area beyond the white buoys.

This court finds that the Corps willfully failed to guard or to warn against a dangerous condition and thus must be held liable for its actions.

*Section 323*

The principle set forth in the Restatement of Torts Second § 323 has been held applicable to the United States. *Blessing, supra* at p. 1187, fn. 38. On June 28, 1981, Maria Rosa was an eight year old non-swimmer. Testimony was presented which showed that among those knowledgable in the area of water safety, innertubes are considered a dangerous instrumentality. That danger increases as the water depths increase and as the swimming ability of the innertube user decreases. Al Schoenebeck knew of this danger, and he specifically testified that he was familiar with the Red Cross Manual.

The female park attendant cannot recall her specific conversation with the Rosa children, or distinguish it from among the many such conversations she had in the course of her duties. However, her testimony as to her usual behavior does not conflict with Andres Rosa's clear recollection of the instructions given to him and his sisters. She got the attention of Maria Rosa and her siblings. She explained the rule in effect at Blue Marsh Lake which prohibited the use of innertubes inside the orange-buoyed area. The children had been in this shallow area for sometime and Maria was with them to hear the employee's instructions. The park employee went on to explain to the children where they *could* use the innertubes—down the beach, beyond the white buoys, in the boat zone. The park employee did not tell the children that the water was deeper in the boat zone than in the shallow area where they had been playing. There were no signs from which the children could tell the difference in water depth between that shallow zone and the boat zone where they were instructed to go. The children could not stand on the shore and observe the depth of the water in the boat zone. The children

*were* familiar with the water depth in the shallow zone. Maria's brother and sister had been able to walk almost to the end of the shallow zone without difficulty and Maria observed this. They did not know that depths would be different in the boat zone where they were instructed to take their innertube.

■ By so instructing Maria Rosa, the park employee rendered services which should have been recognized as necessary for the protection of Maria Rosa. This negligent rendering of service was relied upon by Maria Rosa and she suffered harm because of her reliance. The risk of harm to Maria Rosa was increased by the park employee's enforcement of the innertube policy. Maria Rosa was not aware of, nor warned about, the water depth difference between the orange buoy shallow zone and the boat zone beyond the white buoy. Thus the United States violated the principles of § 323 of the Restatement Second of Torts. The United States was negligent and this court finds it liable in the death of Maria Rosa.

■ Defendant's answer raises the defense of contributory negligence. That argument fails on two grounds. Contributory negligence on the part of the plaintiff, like the negligence of the defendant, is defined as a lack of due care under the circumstances. *O'Neill v. United States*, 411 F.2d 139, 144 (3d Cir.1969). Under Pennsylvania law, a plaintiff who is guilty of contributory negligence, however slight, is barred from recovery against a negligent defendant unless defendant's negligence constitutes wanton or willful misconduct. *Thompson v. Pennsylvania Power Co.*, 402 F.2d 88 (3d Cir.1968). Since this court has found defendant's negligence here to be willful, any negligence on the part of Maria Rosa would not bar recovery. However, the court must go further. When the acts of children are measured to determine if they constitute negligence, the list differs from the objection list applied to adults. A child is held to that measure of care which other minors of similar age, experience, capacity and development would ordinarily exercise under similar circumstances. *Dunn v. Teti*, 280 Pa.Super. 399, 421 A.2d 782, 783 (1980). The law applies several presumptions when evaluating children's conduct. First, minors under the age of seven are conclusively presumed incapable of negligence; (2) minors between the ages of seven and fourteen years are presumed incapable of negligence, but the presumption is a rebuttable one that weakens as the fourteenth year approaches. Third, minors over fourteen years are presumptively capable of negligence with the burden on the minor to prove incapacity. *Kuhns v. Brugger*, 390 Pa. 331, 135 A.2d 395 (1957). Maria Rosa was approximately eight and one-half years old at the time of her death. This court finds that the presumption of incapacity applies and the defendant has not come forward with any evidence which would rebut that presumption.

### Damages

■ Upon consideration of all of the evidence and testimony presented, the court finds the following damages to be appropriate.

| | |
|---|---|
| Wrongful death | $ 4,417.49 |
| Survival | |
| Loss of life's pleasures | 5,000.00 |
| Pain and suffering | 20,000.00 |
| Lost future earning capacity | 150,000.00 |
| Total | $179,417.49 |

In reaching a figure for lost future earning capacity, the court considered the following factors: High school graduate, working to age 65, maintenance expenditure of 75%, a productivity figure of 1% and fringe benefits calculated at 5%.